# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

**v.**                                        **Criminal Action No: 1:07-CR 32**

**JOHN PICKENS,**
        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 20th day of January, 2007, came the defendant, John Pickens, in person and by L. Richard Walker, his attorney, and also came the United States by its Assistant United States Attorney, Zelda E. Wesley, for a hearing on Defendant's "Motion to Suppress Physical Evidence" filed July 16, 2007 (Docket Entry 14). By Order dated July 17, 2007, Chief United States District Judge Irene M. Keeley granted Defendant's motion for leave to file the motion to suppress outside of time and referred the motion to the undersigned United States Magistrate Judge for an expedited hearing and Report and Recommendation (Docket Entry 16). The undersigned subsequently ordered the Government to file an expedited Response to the motion on or before noon, July 20, 2007, and scheduled a hearing the motion for 1:00 p.m. that same date (Docket Entry 17). The Government filed its Response on July 20, 2007 (Docket Entry 22).

### I. Procedural History

There is no dispute the Defendant is a convicted felon. The evidence before the Grand Jury indicates he was convicted of Delivery of a Controlled Substance on or about March 8, 2005, in the Circuit Court of Doddridge County, West Virginia, and of Driving Under the Influence of Alcohol and Causing Death, on December 29, 2000, in the Circuit Court of Doddridge County, West Virginia. There is also no dispute that, prior to his arrest in this case, he resided in Lewis County, West Virginia, where he was supervised by the West Virginia Division of Corrections Parole

Service. On February 10, 2007, parole officers proceeded to Defendant's residence to conduct an after-hours supervision check. The parole officers entered Defendant's home. The parole officers seized a Norinco .22 caliber rifle and a Universal .30 caliber rifle, which are the subject of Defendant's motion to suppress. There is no dispute that there was no warrant issued to search the residence.

## II.  Contentions of the Parties

A.  Defendant contends the warrantless search of his residence, on February 10, 2007, violated his constitutional rights and the evidence seized pursuant to the search must be suppressed because:

1.      The parole officers did not have a warrant to search his house;

2.      The parole officers did not have a reasonable suspicion that Defendant was engaging in criminal activity inside the residence; and

3.      Defendant did not give consent to search his residence, and, in fact, the parole officers "'busted into the trailer' before the Defendant even had an opportunity to consent to the entry and subsequent search."

4.      The conditions of parole signed by Defendant are not an agreement and do therefore not signify a consent to search.  Further, there is no evidence that anyone read or explained those conditions to Defendant.


B.  The Government contends:

1.      Upon their approach to Defendant's trailer, the parole officers saw Defendant through a window, running frantically back and forth.

2.     The parole officers knocked on Defendant's door. After approximately two minutes, Defendant let the parole officers into the house.

3.     Defendant told the parole officers he was nervous because he had consumed half a beer earlier.

4.     Defendant looked at his wife and said, "what about those guns?" while gesturing toward the bedroom.

5.     The parole officers entered the bedroom and saw two guns leaning against a wall in plain view.

### III.  Testimony and Evidence

The Court received the testimony of two witnesses under oath, to wit: West Virginia Department of Corrections Parole Officer Robert Arnold, called by the government, and Rebecca Pickens, Defendant's wife, called by Defendant. The Court also received into evidence Government Exhibits Nos. 1, 2 and 3, which are the "Parole Agreement" signed by Defendant while a prisoner at St. Mary's Correctional Center, prior to his being released on parole; the "State of West Virginia Division of Corrections Rules and Regulations Governing Parole Superision [sic]" signed by Defendant prior to his release on parole;" and "WV Department of Public Safety Division of Corrections Parole Services Rules and Regulations Governing Parole Supervision" signed by Defendant at the Buckhannon Parole Office subsequent to his release; and Defendant's Exhibits 1, 2, and 3, which consist of photographs of a trailer identified by Parole Officer Arnold as similar to, and most likely being Defendant's trailer.

Parole Officer Robert Arnold testified that he is a Supervising Officer for Parolees with almost 10 years experience as a Parole Officer. Defendant was supervised by his office. The

"agreement" to comply with conditions of parole begins within the institution in which the individual is incarcerated, with the Parole Board. If the Parole Board decides to grant an inmate parole, he must abide by the conditions set by West Virginia State Code. Defendant was granted parole by the Parole Board. He signed a standard "Parole Agreement" which states, in pertinent part:

> I, John William Pickens, Serial No. 41414-1, a prisoner of the State of West Virginia, in confinement at St. Mary's Correctional Center, in consideration of being granted release on parole, do hereby agree that during the period of my parole, I shall:
>
> . . . .
>
> 3. Comply with and abide by all the rules and regulations prescribed by the commissioner, division of Corrections or an authorized agent . . . .

Defendant also signed the "Rules and Regulations Governing Parole Supervision [ sic]," which states in pertinent part:

> p. You shall allow your parole officer to visit your place of residence or employment for supervision purposes without obstruction.
> q. You shall submit to a search without warrant of your person, place of residency or motor vehicle by your parole officer for supervision purposes at any time during the parole period.

Finally, Defendant signed the "Rules and Regulations Governing Parole Supervision," which includes the identical conditions labeled p and q in the Rules and Regulations Governing Parole Supervision.

Parole Officer Arnold further testified that "home inspections" conducted by the parole officers are routinely performed without notice and unannounced. On February 10, 2007, Parole Officer Arnold, along with three other parole officers (one a trainee), conducted a home inspection of Defendant's trailer at about 8:30 or 9 p.m. for supervision purposes. Parole Officer Arnold testified that the officers drove up to Defendant's trailer. As they approached the front door he could see there were lights on inside the trailer. Through a window he saw Defendant frantically running

back and forth in the house. He observed him do this three to four times. He believed Defendant's speed in going back and forth was "rather strange to do in one's own home repeatedly," and that he found this behavior "rather erratic."

The officers went up to the door of the trailer. They knocked on the door and identified themselves. There was a delay that Arnold could not describe in seconds or minutes, but, in his "many years of experience knocking on doors" found excessive for a person in trailer. The "excessive" delay "raised [his] suspicion." He testified that Defendant finally opened the door and the officers entered the trailer. He did not recall Defendant's exact words, but he said something to the effect of "come in" and moved back from the door as if to allow their entry. Defendant told the officers he was nervous because he had consumed a half a beer. At that point Arnold "sat Defendant down" in the kitchen area and told him to stay there. He also saw nine cans of beer that were unopened. Arnold testified that Defendant then looked at his wife, Rebecca Pickens, and asked, "what about those guns?" gesturing toward the bedroom. At that point Arnold testified that he told everyone to stay where they were, told the Parole Officer trainee to stay with Defendant and his wife, and went to the bedroom.

Arnold testified that there was either no door on the bedroom or it was wide open. Upon going through the doorway, the officers could see in plain sight two firearms leaning against the wall on the right. They seized the weapons and arrested Defendant.

Upon cross-examination, Arnold testified that he was not present when Defendant signed the "Parole Agreement" or "Rules and Regulations," so he could not testify that someone had read them to Defendant or that Defendant had actually read them himself. He did, however, testify that it was the Parole Office's Standard Operating Procedure that the rules signed at the Parole Office after a

5

parolee's release "are read and explained" to him.

Rebecca Pickens testified that she has known Defendant for 17 years, and was married to him for close to a year. On the day in question she was washing her hair in the sink after dark. Her husband was there, and his father was asleep in a back room. The trailer was a double-wide and very large. She and Defendant occupied a bedroom and a storage room and Defendant's father had a bedroom, storage room and washroom. They shared the kitchen/living room area. They paid for their use of the trailer by performing repairs and paid half the utilities. There was a "little small room" size 8x10 or 10x10 off Defendant's and her bedroom which was to be a master bath but had never been finished.

While washing her hair in the kitchen sink she heard a car pull up outside. The window was steamed up because she was using hot water, so she wiped her hand across to see out. Defendant said "State Troopers," or something to that effect. He walked behind her. She heard people coming up on the porch. There was beer in the refrigerator and took it out and hid it in a cabinet because she knew Defendant was not allowed to have beer. She heard the lock slide on the door and immediately saw the door burst open and Defendant thrown against the wall. The door almost hit Defendant. He had not opened it. The door flew open and Defendant flew back. He was put against the wall. She testified she was "scared to death." Neither she nor Defendant had told the officers to come in and he did not gesture for them to come in. The officers were running through the house from room to room without saying anything. They were "darting through the house looking around." They moved the mattress and headboard in their bedroom. They had not asked for permission and no one gave them permission to search the house. She then heard one officer say, "C'mon here and check this out." He then came walking out of the bedroom with two rifles. She testified that the rifles were

her mother's who had recently passed away. She knew the two rifles had been leaning on a far back wall/storage area and were covered with an orange and black afghan that she threw over them to keep her other things from getting rust on them. She testified the guns were rusty and not operational and were hers.

Rebecca Pickens also testified that Defendant could read, but not "real well." She had to study his letters from jail to read them. His ability to read was about a four on a scale of one to ten (10 being best), and his ability to read "legal documents" was about a two. He had a 10th grade education. In addition he had been in a fight two years earlier in which he was beaten about the head, and had had mental problems since.

Rebecca Pickens testified that she was aware her husband was on parole and that his rights were restricted. She was aware he was not permitted to drink alcohol or have firearms. She did not know the parole officers had the right to burst into her home and search like they did, however. She testified that Defendant did say something about "what about the guns?" but that occurred after the officer came out with the guns. Until that point both she and Defendant had forgotten the guns were even there. She also testified that she knew Defendant was not allowed to have beer, but the beer was his father's and she did not know it could not be in the refrigerator. Still she hid the beer when the officers showed up.

### IV. Discussion

A parolee has diminished rights under the Fourth Amendment. *United States v. Reyes*, 283 F.3d 446, 458 (2d Cir. 2002). As such, no probable cause is required for a probation officer to visit the home of a convicted person serving a term of supervised release without a warrant, even absent consent. *Griffin v. Wisconsin*, 483 U.S. 868, 878, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987). After *Griffin* was decided, the Supreme Court again addressed the diminished rights due to persons under court supervision in *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 l. Ed. 2d

497 (2001). In *Knights*, a warrantless search was conducted by a regular law enforcement officer who was aware of the defendant's probationer status. The defendant had agreed to warrantless searches of his home by probation officers as a condition of his release. In light of such prior consent, the Supreme court found that the search required only reasonable suspicion. *Id.*

In this case, while Wilson did not explicitly consent to warrantless searches, he did consent to "home visits." Thus, he was aware that his expectation of privacy was diminished by virtue of his parolee status. *See Reyes*, 283 F.3d at 460-61. In addition, the "search" was conducted by his parole officer, who merely walked through the house, not opening closets or drawers. Given the circumstances of Wilson's parole, we find that the officer need only, at most, reasonable suspicion to conduct a walk-through of Wilson's home under *Knights*.

Reasonable suspicion determination are base don the totality of the circumstances in light of the officers' experience and specialized training. *United States v. Arvizu*, 534 U.S. 266, 273-274, 122 S. Ct. 744, 151 L.Ed. 2d 740 (2002).

U.S. v. Wilson, 105 Fed. Appx. 498 (4th Cir. 2004) (unpublished). After Wilson was decided by the

Fourth Circuit, the United States Supreme Court further addressed the issue of diminished rights of

parolees in *Samson v. California*, 126 S. Ct. 2193 (2006). In *Samson*, the Supreme Court held that

a warrantless and suspicionless search of a parolee's person outside the home by a police officer did

not violate the fourth Amendment.

The undersigned first finds that Defendant expressly granted the parole officers the right to

search his home by signing both the "Parole Agreement" and the "Rules and Regulations" referred

to in the "Parole Agreement." Defendant argues that these documents do not constitute actual

agreements or contracts and that therefore the parole officers were not allowed to enter the house and

search without consent or a warrant. Instead, had Defendant not allowed them to enter, their only

recourse would have been to arrest him or get a warrant to search. The undersigned does not agree

with this proposition. First, the agreement is expressly named "Parole Agreement." Second, it states

that "in consideration of being granted release on parole [I] do hereby agree that during the period

of my parole, I shall . . .. [c]omply with and abide by all the rules and regulations prescribed by the Commissioner, Division of Corrections or an authorized agent. The Rules and Regulations then expressly state that a parolee "shall submit to a search without warrant of your person, place of residence or motor vehicle by your parole officer for supervision purposes at any time during the parole period." The undersigned finds the documents signed by Defendant constitute not only an agreement but an express consent to search his residence. Certainly he had no expectation of privacy that society would recognize as legitimate, as Defendant argues, once he signed the documents expressly informing him that he must submit to a search of his residence without a warrant.

Defendant did not strenuously argue, but did point out that he did not read very well and had other mental problems. There is no dispute, however, that Defendant signed all of the documents. There was also no evidence presented that Defendant did not know his conditions of release. Parole Officer Arnold credibly testified that it was the standard practice of the parole office to read and explain the conditions to the parolee. There was no evidence presented that this had not been done in this case. Finally, Defendant's and his wife's actions in hiding the beer and Defendant's statement, "what about the guns," whenever it was made, constitute evidence that he was aware he was not permitted to have those items, which is further evidence that he was aware of his conditions of parole.

Finally, even if Defendant had not expressly consented to the search of his residence, which the undersigned finds he had, the undersigned finds the testimony of Officer Arnold credible in that he observed Defendant running back and forth in a suspicious manner after he knew at least some variety of law enforcement was coming to his door. After the officers knocked, there was a "suspicious" delay in answering the door. Under the circumstances, the undersigned finds the

officers had reasonable suspicion, in light of Officer Arnold's experience and training, to enter and search the residence.

**V.**

For the reasons herein stated, the undersigned accordingly recommends defendant's Motion to Suppress Physical Evidence [Docket Entry 14] be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of July, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE